```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 - - - - - - - - - - - - - - - - X

 UNITED STATES OF AMERICA      :      13-CR-708 (JG)

       -against-                      U.S. Courthouse
                               :
                                      Brooklyn, New York
 RAYMOND JONES

                 Defendant     :
                                      April 2, 2014
 - - - - - - - - - - - - - - - - X    11:30 a.m.


 BEFORE:
            HONORABLE JOHN GLEESON
            United States District Judge



 APPEARANCES:

 For the Government:       LORETTA E. LYNCH
                           United States Attorney
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                           BY:  MARGARET ELIZABETH LEE
                                Assistant U.S. Attorney


 For the Defendant:        FEDERAL DEFENDERS OF NEW YORK, INC.
                           One Pierrepont Plaza
                           16th Floor
                           Brooklyn, New York 11201
                           BY:  MICHAEL DANIEL WEIL




 Court Reporter:           RONALD E. TOLKIN, RPR, RMR, CRR
                           Official Court Reporter
                           225 Cadman Plaza East
                           Brooklyn, New York 11201
                           718-613-2647
```

1        THE CLERK:  United States of America against Raymond
2   Jones.
3        THE COURT:  State your appearances, please.
4        MS. LEE:  For the United States, Maggie Lee.  Good
5   morning.
6        THE COURT:  Good morning.
7        MR. WEIL:  Federal Defenders by Michael Weil, with
8   Mr. Jones.  Good morning, Your Honor.
9        THE COURT:  Good morning.  Good morning, Mr. Jones.
10       THE DEFENDANT:  Good morning.
11       THE COURT:  All right.  I was hoping to get you an
12  opinion by now.  I'm going to give you an opinion orally
13  rather than hold the case up further.
14       The motion before me is the defendant's motion to
15  suppress evidence.  Mr. Jones is charged with being a felon in
16  possession of a firearm, and he has moved to suppress the
17  firearm that was seized from him when he was arrested on
18  November 13th of last year.  He also seeks to suppress
19  statements made by him to the police while he was in custody
20  after his arrest.
21       I took testimony from the government's witnesses on
22  February 27th, and then testimony from another member of the
23  police department called by the defense on March 6th.  I may
24  from time to time refer to the transcript pages of those two
25  appearances.  They weren't paginated consecutively, so when I

1  say Transcript A, I will be referring to the February 27th
2  transcript; Transcript B will refer to the March 6th
3  transcript.
4      For the following reasons the motion is granted.
5  The weapon and the post-arrest statements are suppressed.  Let
6  me first make findings of fact based on the evidence that I've
7  heard.
8      On the evening of November 13th of 2013, Police
9  Officers Andrew Kamna, Richard Cleri, Renee Castellano, Steven
10 Franzel and Sergeant Matthew Cahill, all of the New York City
11 Police Department, were investigating a shooting that had
12 occurred earlier that day on Pacific Street in Brooklyn.
13     The officers were dressed in plainclothes and were
14 driving two unmarked Chevrolet Impalas.  Kamna was driving one
15 car with Castellano in the front passenger seat of that car.
16 The other car was driven by Cleri, with Sergeant Cahill in his
17 front passenger seat, and Officer Franzel in the rear
18 passenger seat.
19     At about 11:40 that night the officers were driving
20 to an address on Bergen Street between Saratoga Avenue and
21 Howard Avenue where Kareem Barnes, who was the suspect in the
22 shooting, was known to frequent.
23     As the cars turned from Saratoga Avenue onto Bergen
24 Street heading west, the car driven by Cleri was directly in
25 front of the car driven by Kamna.  As Kamna turned on to

Bergen Street he noticed a tan SUV. He identified it both as a Jeep and an SUV, but everyone seemed to call it an SUV throughout the hearing. That is what I will call it now.

As he made the turn onto Bergen Street, Kamna saw the SUV pull off from a parked position into traffic. It had been parked about a third of the way down the block, and it drove westbound on Bergen, a one-way street, toward Howard Avenue.

Cleri had pulled his car over to the right side of the street so the officers could look for the address they had set out to find. Kamna pulled his car up on the left side of Cleri's car, and Kamna spoke across Castellano, who was next to Kamna in the passenger seat, to Cleri through the open windows of the cars.

Kamna told Cleri he was going to pull the SUV that had just pulled out over and he was going to stop that car. Kamna then proceeded past Cleri's car and followed the SUV.

Kamna's decision to pull over the SUV amounted to a change in the plan. Sergeant Cahill, who was in charge, was in Cleri's car and he had been looking for the address Barnes was supposed to frequent but, that task ended when Cleri's car left the block to follow Kamna's.

Cleri's car proceeded down Bergen Street, but it was a significant distance behind Kamna's. At the end of the block Bergen Street ends and forms a T with Howard Avenue,

1  which goes one way northbound.  Kamna turned right onto Howard
2  Avenue directly behind the SUV.
3              The car driven by Cleri followed some distance
4  behind Kamna.  After the SUV traveled one block north on
5  Howard Avenue, it crossed Dean Street.  Kamna then turned on
6  his lights and siren and pulled the SUV over.
7              It stopped immediately on the left side of Howard
8  Avenue about halfway between Dean and Pacific Street.  Kamna
9  pulled over behind the SUV.  Cleri's car caught up and parked
10 behind Kamna's.  Kamna got out of his car and approached the
11 driver's side of the SUV.
12             Cleri and Franzel exited their car and also
13 approached the driver's side of the SUV, several steps behind
14 Kamna.  Cahill and Castellano approached the passenger side of
15 the SUV.
16             Kamna asked the driver, the defendant Raymond Jones,
17 for his license, registration and proof of insurance, which
18 Jones provided.  Jones was alone in the vehicle, and the
19 license, registration and proof of insurance were all in
20 order.
21              Kamna testified that as he looked into the SUV, he
22 noticed an aluminum can in the right inside pocket of Jones'
23 jacket.  He further testified that he asked Jones to hand him
24 the can, which Jones did, and that the can was three-quarters
25 full of beer.  Kamna testified that he took the can, turned

and walked one or two steps and placed it down on the street.

One of the officers asked Jones to step out of his vehicle, which he did. When Jones got out of the SUV, Franzel and Cleri were about an arm's length away. Cleri testified that the left side of Jones' jacket had a bulge in it, which appeared to be something heavy, causing that side of the jacket to hang lower.

Cleri grabbed the bulge through Jones' jacket and it felt like a gun. Cleri then wrapped his arm around Jones' waist and told Kamna and Franzel to place him in handcuffs. After Franzel handcuffed Jones, Cleri reached into Jones' left inside jacket pocket and removed the loaded .38 caliber Smith & Wesson firearm that's one of the subjects of this motion to suppress. The officers then transported Jones to the 73rd Precinct. If indeed there was a beer can seized from Jones, they left it at the scene.

At the precinct Jones was informed of his Miranda rights, which he waived. At some point later that night he told Kamna and Cleri that he had the gun for protection because he'd been shot earlier in the year and was worried that the person who had shot him was still in the area.

Those are my fact findings, but I need to address the testimony I decline to credit. The government elicited evidence in opposition to the motion that was inconsistent with the findings I've just made.

1        I decline to credit that testimony for the reasons
2   that follow:  First, relating to the decision to follow and
3   stop Jones, Kamna testified that when he pulled his car up
4   next to the car driven by Cleri, he asked Cleri whether the
5   tan SUV had just pulled away from the curb.  More importantly,
6   he denies saying anything about planning to pull the SUV over.
7   Cleri's testimony is consistent with Kamna's on this point.
8            Cahill, on the other hand, testified that Kamna
9   mentioned something about pulling a car over and someone
10  pulling out of a spot.  That's Transcript B at 6.
11           Upon further questioning, Cahill altered that
12  account, stating he was actually unsure whether Kamna said, "I
13  am going to pull that vehicle over," or he said that the
14  vehicle had pulled out.
15           Finally, Cahill also testified that when he
16  initially discussed this case with the AUSA and the case agent
17  in preparing for the suppression hearing, he told them
18  unequivocally that Kamna said he was going to pull over the
19  SUV.
20           For his part, Franzel offered yet a third version of
21  these events.  He believed that Kamna did not stop his car
22  next to Cleri's at all.  And he does not remember Kamna saying
23  anything to the officers in the other car.  Castellano, who
24  sat right between Kamna and Cleri when the disputed statements
25  were made, didn't testify.

RONALD E. TOLKIN, RPR, RMR, CRR
OFFICIAL COURT REPORTER

1          I credit the first portion of Cahill's testimony as
2 well as the consistent statement he made to the prosecutor and
3 the case agent.  Specifically, I find that Kamna told his
4 brother officers in Cleri's car that he was going to stop the
5 SUV.  He may well have specified that the SUV he was going to
6 stop was the one that had just pulled out.
7          But contrary to his hearing testimony, he told his
8 brother officers that he was going to stop that vehicle.
9 There are multiple anomalies in Kamna's testimony.  First, he
10 insisted that all he said to Cleri was a question about
11 whether Jones' car had just pulled away.  See for example
12 transcript A at 40.
13          But Kamna saw Jones' car pull away.  He testified to
14 that repeatedly.  That's at Transcript A, page 15, at 18, at
15 37, and again on 37.  There was no need for the question.  And
16 since Kamna in fact followed and stopped Jones, it seems clear
17 to me, and I find, that Kamna told Cleri that he was going to
18 stop Jones' car.
19          A further anomaly can best be put this way:  If
20 Kamna actually told the truth at the hearing, why did he leave
21 the block?  Kamna insisted that he was not following Jones and
22 had no intention to stop Jones when he first began driving
23 behind him.  As discussed below, he claimed that he decided to
24 stop Jones only after Jones later rolled through a stop sign.
25          The testimony that he wasn't following Jones and had

1  no intention to stop him made no sense.  Kamna and the other
2  officers were on that block that night for a reason, to
3  eyeball an address where they might find Barnes, a suspect in
4  a very recent shooting, and they hadn't yet accomplished that
5  goal.
6              Kamna didn't just drive away from his supervisor,
7  Cahill, for no reason, as his testimony suggested.  I find
8  that he drove away to stop Jones' car.
9              Third, Kamna's testimony is internally inconsistent.
10 When asked by the prosecutor why he asked Cleri if Jones had
11 just pulled out, Kamna answered, "It was just a general
12 inquiry to the car pulling off."  That's in
13 Transcript A, page 18.
14             And again, Kamna's insistence that he wasn't
15 following Jones down the block and had no intention to stop
16 him, his testimony at one point suggested that it didn't
17 matter to him that Cleri told him that Jones had just pulled
18 away.
19             Yet Kamna admitted that it concerned him that
20 someone would pull away in response to the presence of two
21 police cars.  That's at Transcript A, page 37.  It made him
22 suspicious of Jones even though, I should make this clear,
23 Kamna knew that Jones was not the suspect they were on the
24 block to look for.  That's at page 38 of Transcript A.
25             The truth is, and I find, that Kamna became

1  suspicious of Jones based on the simple fact that Jones pulled
2  away as the two Impalas containing the police pulled down the
3  block.  That was enough for Kamna to decide he was going to
4  pull Jones over.  He pulled up to his colleagues and told them
5  as much.  He didn't pull away aimlessly, but rather with the
6  intention to stop Jones.  However, he knew that his hunch
7  about Jones wasn't enough, and he had no legal justification
8  for such a stop, so he falsely denied his intention.
9  　　　　　The other component of the government's evidence
10 that contains testimony I don't credit is whether Jones failed
11 to stop at the stop sign where Bergen meets Howard.  Contrary
12 to my findings of fact, Kamna testified that he saw Jones' SUV
13 roll through a stop sign as it turned right from Bergen onto
14 Howard.
15 　　　　　I don't credit Kamna's testimony.  He falsely denied
16 that he followed Jones' car with the intention to follow it.
17 He falsely denied that he told the officers in Cleri's car
18 that he was going to stop that car.  I don't credit his
19 testimony that his decision to stop Jones was rescued from
20 illegality by a fortuitous traffic violation between the time
21 he formed his intention and the time he made a stop he had
22 already decided to make.
23 　　　　　I should add here that if in fact Jones rolled
24 through the stop sign, that would justify the stop of his car
25 by Kamna, even if Kamna had no interest in the traffic

violation.  Pretext stops of this type are permitted under the law.

But Kamna wasn't the only one to testify that Jones rolled through a stop sign.  Cleri and Franzel testified to that as well.  Cleri testified that the car he was driving was only two or three car lengths behind Jones' SUV, with Kamna's car in between, and that he, Cleri, could see Jones' car well.

Franzel testified that the car he was in with Cleri was approximately three car lengths behind the SUV.  Cleri and Franzel both testified that they saw the SUV slow down but not completely stop at the stop sign at the intersection of Bergen Street and Howard Avenue.

This testimony can't be reconciled with Sergeant Cahill's testimony.  Cahill was in charge.  Once he and the other officers in Cleri's car broke off to follow Kamna's car, Cahill was no longer looking at the buildings for the location that the suspect was said to frequent, but rather his attention was drawn to whatever car Officer Kamna was following.

Bergen Street is one way, single lane.  Cahill testified that he didn't know what car Kamna was referring to and did not see Jones' car until it had been pulled over on Howard Avenue.

In addition, he testified that as they drove down Bergen Street, Kamna's car was well ahead of the car he was in

1  with Cleri and Franzel.  In testimony I credit, he testified
2  that he didn't know the reason Jones' car had been stopped
3  until Kamna later told him about it, later on that night.
4        Cahill's testimony, which I credit, can't be
5  reconciled with that of Franzel and Cleri that Jones' alleged
6  illegal rolling through the stop sign was visible to them,
7  because they were only a few car lengths behind him at the
8  stop sign.  Cahill was in the front passenger seat, in the
9  best position from which to make those observations.  He
10 didn't make them.  He didn't see the car until after it was
11 stopped.
12       In short, I credit Cahill.  I credit Cahill's
13 testimony.  And for that reason I don't credit the testimony
14 of Franzel and Cleri that they observed a traffic infraction
15 from behind the car.
16       The government states in its papers, in its effort
17 to undermine Cahill's testimony, that he stated that he did
18 not remember anything between the time his car started to
19 drive after Kamna's and the time Kamna pulled over the
20 defendant's car, and it cites Transcript B, page 9.  But that
21 is not exactly his testimony.  Cahill testified unequivocally
22 that he did not see Jones' car make a right-hand turn.
23       The Fourth Amendment forbids the government from
24 violating a right to people to be secure in their persons,
25 houses, papers and effects against unreasonable searches and

1  seizures.  It doesn't prohibit all searches and seizures, only
2  those that are unreasonable.
3           A warrantless search is unreasonable unless it falls
4  within one of the well-delineated exceptions to the warrant
5  requirement exception.  At issue here is whether there was
6  probable cause to believe that a crime has been committed and
7  that the person seized has then committed it.
8           It is the government's burden to establish the
9  legality of a warrantless search by a preponderance of the
10 evidence.  In light of my fact findings and considering the
11 totality of the circumstances, I conclude that Kamna lacked
12 probable cause or any justification under the Fourth Amendment
13 for the stop of Jones' car.
14          He decided he wanted to stop Jones' car.  He acted
15 on a hunch, and it was a good hunch.  But the law requires
16 more before a person can be subjected to conduct that
17 implicates the Fourth Amendment.  Because the firearm was the
18 result of an unlawful arrest, as were the post-arrest
19 statements, all of the evidence is suppressed.  See *Wong Sun*
20 *versus United States*, 371 U.S. 471 at 487 at 488.
21          I want to once again commend the prosecutor, the
22 government for its conduct in this case.  Obviously a key fact
23 in the case is Cahill's statement to the prosecutors when they
24 prepared him for the hearing that Kamna had said to Cahill and
25 the other officers in the car that he was going to pull over

1  the SUV.

2         The disclosure of that fact to defense counsel
3  amounted to nothing more than the government fulfilling its
4  Constitutional obligation.  But the fact is that in some
5  places that obligation isn't always fulfilled.

6         I have no crystal ball.  Fact findings like these
7  are very hard to make.  All I can do is my best, which I've
8  done, and based on the facts as I've found them, the motion
9  has to be granted.  So, the evidence is suppressed.

10        You probably want a little time to consult with the
11 folks in your office.

12        MS. LEE:  Thank you, Your Honor.

13        THE COURT:  So why don't we put the case down for a
14 status conference about a month from today.  And I am
15 assuming, and it's just an assumption, I might be wrong, I
16 assume that the evidence I've suppressed is the heart of the
17 case, so the next step is either a notice of appeal or a
18 dismissal.

19        MS. LEE:  That's correct, Your Honor.

20        THE COURT:  Either way, there is no need to come
21 back unless you want to come back.  And you are always welcome
22 to come back.  It is always a pleasure to see you both.  But
23 if a decision is made within those 30 days one way or the
24 other, you can just let us know.  If it is a dismissal, just
25 submit a letter to that effect, I will dismiss the charge.  If

1  it is a notice of appeal, it is out of my hands in another
2  court.
3              All right.  Does that make sense in light of my
4  ruling?
5              MS. LEE:  Yes, Your Honor.
6              THE COURT:  Ilene, let's pick a date.
7              THE CLERK:  May 6th at 11:00.
8              MR. WEIL:  Your Honor, is this the only decision the
9  Court is going to make, there is not going to be a written
10 decision to follow or it's just the transcript?
11             THE COURT:  No.
12             MR. WEIL:  Thank you.
13             THE COURT:  Thank you.  Have a good day.
14             MR. WEIL:  Thank you, Your Honor.
15             MS. LEE:  Thank you.
16             (Matter concluded.)
17
18
19
20
21
22
23
24
25